HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARLA TOLLIVER, et al., | No. 10-cv-5056-RBL |
| Plaintiffs, | ORDER ON SUMMARY JUDGMENT |
| v. | [Dkts. #79, 90, 94] |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

On March 17, 2007, a group of teenagers spent an evening drinking and socializing at a home on the Lower Elwha Indian Reservation. In the early morning hours, seven of the revelers piled into a car to head home. Two—Ronald Scroggins and Vanna Francis—would never arrive. Plaintiffs are the parents and estates of the two deceased teenagers. They argue that their children's deaths were caused in part by a lack of signs and lighting on a dangerous road—errors for which Clallam County and the federal government should answer. Plaintiffs have moved for partial summary judgment, asking the Court to rule that the County and the United States breached their duties to maintain safe roads and thereby caused the accident.

In response, Clallam County and the United States each argues that the other owns the portion of road on which the accident occurred, and thus, the duty lay elsewhere. Further, the County argues that the road was properly signed, and that in any event, road conditions did not cause the accident—intoxication did.[1] By all accounts, the driver of the vehicle, Defendant Sela Kalama, was severely impaired.

After reviewing all briefing and evidence submitted, the Court grants summary judgment to Clallam County and the United States. This is a tragic story, but neither the County nor the United States had a duty to maintain the road in 2007, and in any event, no reasonable factfinder could conclude that this accident was caused by anything other than alcohol, an automobile, and a disastrous teenage disregard for danger.

## I.   FACTS

**A.  The Accident**

The night began as many do: a flurry of phone calls, a gathering of friends, laughing, drinking. A group of teens met early in the evening at a tribal boat launch, where the Lower Elwha Road runs straight into the Elwha River. Amongst the group were Jolene Barkley, Darryl Svec, and Sela Kalama. Ms. Barkley testified at deposition that Ms. Kalama drove her to the river, where they met a second car of friends. (Fobes Decl., Ex. 4, Dkt. #91 at 51 (Excerpt of Barkley Dep., 22:4–23);[2] *see also* Ex. 5 (Excerpt of Svec Dep., 23:20; 24:23–25)).[3] Mr. Svec, a

---

[1] The Court notes that the County moved for summary judgment in its response to Plaintiffs' motion. (*See* Clallam County's Resp., Dkt. #90.) Although the response is not labeled as a motion, both the Plaintiffs and United States responded as though it were. (*See* Pls.' Resp., Dkt. #104; United States' Resp., Dkt. #109.)

[2] Ms. Barkley stated:

member of the group already at the river, testified that the earlier-arriving car had nearly driven off the end of the road and into the water—an incident witnessed by Ms. Kalama. *Id.*

The group then reconvened at a friend's house for an evening of drinking—heavy drinking. Indeed, Tamera Luce stated that everyone at the party was noticeably drunk. (*Id.*, Ex. 5 (Excerpt of Luce Dep., 15:11–13) ("Q. When you say "a lot," were people noticeably drunk? A. Yeah, stumbling.")). A number of partygoers were smoking marijuana. (*Id.*, Ex. 4, 28:8–25 (Barkley Dep.); Ex. 5, 28:22–29:4 (Svec Dep.)).

The party began to break up somewhere around 2:00 in the morning. Ms. Kalama offered to drive. Mr. Svec described Ms. Kalama's state of extreme intoxication:

> A. [S]he was drinking a lot. She was . . . one-eyeing it.
> Q. When you say that, what do you mean?
> A. . . . . [S]he was sitting at her, at her car, you know, one eye on her phone so that she could concentrate. That's how . . . messed up she was.

(Fobes Decl., Ex. 5, 27:22–28:3 (Svec Dep.)). Ms. Barkley echoed the point:

> Q. And did you see Sela drinking that night?
> A. Yes.
> Q. And do you know how much she had to drink?
> A. No, I don't know for sure, but I know that we were both really intoxicated.
> . . .
> A. And Sela is like, "I'll drive, I'll drive." She's like ***staggering*** . . . .

(*Id.*, Ex. 4, 25:24–25:3; 29:10–15 (Barkley Dep.) (emphasis added). Another friend even begged Ms. Barkley not to get into the car:

> [He] was like freaking out and was like, "Don't drive, no, don't drive, don't leave, don't leave," freaking out. He was like in my face.
> . . . .
> He was like, "No, please, Jojo, no, please." He was like begging me not to get in that car.

---

> A. . . . . Sela was driving, we went and drove down to the river, and we—I remember right when we pulled up—it was all foggy, it was really, really foggy that night. . . . They were all parked right there, we were parked right there.
>   And I remember Gabby and then getting out, freaking out, Gabby and Fox. They were like, "Oh my God, oh, my God. We just almost went off the edge, we just almost went off the edge.

[3] Mr. Svec stated:
> A. Oh, yes, Sela was there I remember, because—yeah, she was there because she almost watched us go in.
> . . .
> Q. Where was Sela that she saw this happen? A. Because she was—she was with JoJo [i.e., Jolene Barkley] and them. And that's whose car they were in that whole night, because they were all kicking it together, her, JoJo, and Amy.

Order - 3

(*Id.*, Ex. 4, 29:13–23 (Barkley Dep.)). Ms. Kalama even sent a text message approximately an hour and a half before the accident that said, "I'm drunk." (McGillis Decl., Ex. 1 at 6, Dkt. #80 (Plea Agreement)). She admitted that she "knew she was 'impaired'" to police after the accident. (*Id.*) Despite Ms. Kalama's clear intoxication, Ms. Barkley and Mr. Svec got into the front seat; in the back were Tamera Luce, Brian Svec, Ronald Scroggins and Vanna Francis. (*Id.*, Ex. 6, 17:14–21 (Luce Dep.)).

The group decided to return to the river, the site of the earlier near-accident. While driving, Ms. Kalama was apparently reading text messages on her phone and could barely keep the car on the road:

> [S]he was on her phone and she swerved in the ditch. I was like, "What the ---- are you doing? Get off your phone." I said, You ain't doing that . . . with me in the car."
> She's like, "I'm good, I'm good. Okay, I'll put it away."
> I was like, "I'm serious. Put that away, dude." I was like, You're all f----d up." . . . And she put it down. Two minutes later, she gets another text and she's back on the phone.

(*Id.*, Ex. 5, 32:17–33: 2 (Svec Dep.)). Ms. Barkley also stated that Ms. Kalama was looking at her phone and almost ran into a tree. (*Id.*, Ex. 4, 32:13–14 (Barkley Dep.)).

> Everybody was yelling at her by then. It was like, "Get off your phone."
> She was like, "I'm fine, I'm fine."
> Then she shut it just to pretty much shut everybody up. Darryl was like, "Let me drive. Stop. Let me drive. Let me drive."

(*Id.*, Ex. 4, 32:16–21 (Barkley Dep.)).

Ms. Kalama was also speeding. As Mr. Svec relates: "We were going like at least – she was going fast, man. I tried telling – like she was at least going 30, 35 [mph] I remember. She was going way faster than – way faster than Gabby and them was. I remember that." (*Id.*, Ex. 5, 34:7–11 (Svec Dep.)). Ms. Kalama admitted the same. (McGillis Decl., Ex. 1 at 6, Dkt. #80 (Plea Agreement)). And no one was wearing seatbelts. (*Id.*, Ex. 5, 34:1–4 (Svec Dep.) ("Q. [D]id anybody put on seat belts? A. No. Too many bodies in the car.")).

As Ms. Kalama drove down the road, highbeams on, she passed a *Pavement Ends* sign and a *Dead End* sign; the marked lanes disappeared, brush began to encroach, the road narrowed and turned to gravel. (*See* Ballard Decl. ¶¶ 8–10.) Ms. Kalama was expecting Mr. Svec to tell her when to stop. (McGillis Decl., Ex. 2, 88:17–23, Dkt. #80). The passengers yelled at her, Mr.

Order - 4

Svec rolled down his window. It was too late. The car pitched from the road into the river. The seven teens attempted to get out as water rushed in. Ronald Scroggins and Vanna Francis did not survive.

The first officer responding to the scene "observed a pair of tracks that went up to the water's edge," but "*there were no signs of braking*." (McGillis Decl., Ex. 16, Dkt. #80 (police report) (emphasis added)).[4]

In December 2007, Sela Kalama pled guilty to involuntary manslaughter. (McGillis Decl., Ex. 1, Dkt. #80 (Plea Agreement)).

Plaintiffs highlight a few ultimately immaterial factual issues. First, contrary to Ms. Barkley and Mr. Svec's accounts, Ms. Kalama states that she had never been to the river before driving into it (i.e., she had not been to the river earlier that evening). (Pl.'s Reply to County's Cross Mot. for Summ. J. at 15, Dkt. #104.) In her plea agreement, however, she "acknowledges that witnesses would testify" that she had been to the river earlier that evening, had driven to within "10-20 feet of the river's edge," and had discussed how the earlier car "had stopped . . . just before driving into the river." (McGillis Decl., Ex. 1 at 7, Dkt. #80 (Plea Agreement)). Second, Ms. Kalama has stated that she did not have 14–16 beers prior to the accident, as she told police. Rather, she had only 4–6 drinks. (*Id.* at 16.) Notably, while Ms. Kalama's statements waver on the number of drinks she consumed, Ms. Kalama does not appear to have ever asserted that she was sober on that evening. Plaintiffs' expert medical witness, Dr. Jennifer E. Souders, was able to conclude only that one could not objectively determine Ms. Kalama's blood-alcohol concentration ("BAC") at the time of the accident.[5] (Supp. McGillis Decl., Ex. 6 at 3, Dkt. #105 (Report of Dr. Souders)). Lastly, Ms. Kalama said at deposition that she wasn't

---

[4] While third-party statements in police reports are hearsay, personal observations of officers are admissible. *Colvin v. U.S.*, 479 F.2d 998, 1003 (9th Cir. 1973); *U.S. v. Sims*, 617 F.2d 1371, 1377 n.10 (9th Cir. 1980).

[5] Dr. Souders does state, somewhat confusingly, that "if there is no scientific merit in calculating an estimate of the BAC at the time of driving, then it is not reasonable to conclude that Ms. Kalama was impaired or intoxicated by alcohol at the time of the accident." (McGillis Decl., Ex. 6 at 3, Dkt. #105.) This is wrong. Simply because a doctor cannot later measure BAC does not mean that a driver must have been sober. It simply means that the doctor cannot measure BAC. Multiple witnesses state that Ms. Kalama was severely intoxicated, her own post-accident statements say the same, and indeed, Ms. Kalama herself has never claimed she was sober. Put another way, Dr. Souders has concluded that if a tree falls in the woods, and nobody is there to measure the volume, the crash makes no sound. Leaving aside metaphysical concerns, the tree makes a sound. The absence of a recording does not make it otherwise.

"texting," rather she just "flipped [her] phone open, and then I just quickly put it back under my leg." (McGillis Decl., Ex. 2, 88:9–13, Dkt. #80 (Kalama Dep.)).

### B. The Lower Elwha Road

Because Plaintiffs assert that the lack of signs and lighting caused, as least in part, the deaths of Mr. Scroggins and Ms. Francis, it is important to understand the road's layout and its history of ownership.

#### 1. Layout of the Lower Elwha Road

The Lower Elwha runs east-west, a straight shot running directly into the river. It has two lanes, but narrows to one-and-a-half lanes about a half mile before its end. The road is paved up to 93 feet before the river's edge, at which point it turns to gravel. (*See* Pl.'s Mot. for Partial Summ. J. at 4.)



(Pl.'s Mot. for Partial Summ. J., Appx. A, Dkt. #79-1 (Map of Lower Elwha Road)).

Until somewhere between 2001 and 2003, the County maintained a gravel berm at the end of the road.  Then, members of the Lower Elwha tribe demanded that the berm be removed because it interfered with the boat launch. (McGillis Decl., Ex. 11 at 16, Dkt. #80 (Dep. of former County road maintenance supervisor Michael Roening); *see also* Ex. 4 (Dep. of County engineer Ross Tyler)).  Mr. Roening, a former county road maintenance supervisor, states that a fisherman at the river made the initial request.  Roening refused, saying, "somebody's going to run into the river." (*Id.*, Ex. 11 at 15.)  Following that conversation, a tribal police officer and (apparently) another tribal official demanded removal. (*Id.*, Ex. 11 at 17.)  Indeed, Mr. Tyler, the county engineer, described the Tribe's request as a "cease and desist" order. (*Id.*, Ex. 4 at 56.) Mr. Roening states that he resisted removing the berm and informed the tribal officials that he would not remove the berm without an order from his supervisor because "somebody [would] run into the river and drown." (*Id.*, Ex. 11 at 16.)  A day or so later, Mr. Roening's supervisor instructed him to remove the berm. (*Id.*, Ex. 11 at 17.)  The County then advised the tribe to "put up stuff, but the only signs that were ever put up was during flooding." (*Id.*)  Thus, at the time Sela Kalama drove her car into the river, there was no berm.

Following the accident, a tribal administrator sent an email to Mr. Tyler, noting that "[p]iles were removed by request of the Tribe to facilitate boat launch access.  We don't need to mention this unless absolutely necessary. Just so you know.  This is so awful." (Fobes Decl., Ex. 1, 117:12–120:17 (Tyler Dep., Ex. 1)).  Importantly, the tribal administrator also instructed Mr. Tyler to put the berm back across the road. (*Id.*)

**C.  Ownership of the Lower Elwha Road**

Since the advent of this suit, the United States and Clallam County have each sought to declare that the other owns the last section of road that runs into the river.  Plaintiffs, on the other hand, assert that the United States owns it, but the County "possessed" it (ideally making both Defendants liable).

For ease of reference, the parties have taken to splitting the road into two sections: Section A (ownership of which is nondisputed) and Section B (ownership of which is vigorously

disputed). As Ms. Kalama traveled west towards the river, she first crossed Section A, the clearly maintained county road. All parties agree that the County owns Section A.

As she neared the river, Ms. Kalama crossed into Section B. Section B begins at a surveying line that is key to establishing ownership of the road. The Lower Elwha Road runs along a border between two larger surveying sections—Section 27 (to the north) and Section 34 (to the south).[6] As she approached the river, Ms. Kalama crossed a longitudinal border separating the quarters of those larger sections, also called the "quarter-corner." (In the map above, this is the vertical line on the left.) The quarter-corner is approximately 1,125 feet from the river. (Pl.'s Mot. for Partial Summ. J. at 2.) Section B, as the parties have taken to calling it, consists of those last 1,125 feet of the road—from the quarter-corner to the river.

In sum, Section A lies east of the quarter-corner and entirely south of the common line between Section 27 (on the north) and Section 34 (on the south). Section B lies west of the quarter-corner, but as the map above makes clear, Section B lies largely in Government Lot 3 of Section 27—to the north of the common line (although some lies south in Section 34).[7] Now that the location of the Lower Elwha Road is in place, the question of ownership can be addressed.

In attempting to establish (or avoid) ownership, the parties rely on wide variety of documents, including deeds, a government proclamation, and even road maintenance logs going back to the early 1900s. The history of ownership is therefore somewhat tortured. The County first surveyed Section B in 1917 after being petitioned by residents. (*See* Decl. of David Ironmonger, Ex. C, Dkt. #30-3 (County Commissioner's Journal); Ex. E, Dkt. #30-4 (Road Docket noting map of new road extension was filed)). Title to Section A was clearly deeded to the County. (Ironmonger Decl, Exs. A & B (deeds from Goodwin, Sturdivant, and Hickock). Title to Section B, however, does not appear to have been deeded to the County.

---

[6] Township 31 North, Range 7 West, of the Willamette Meridian. (*See* United States' Cross Motion for Summary Judgment, Dkt. #94 at 3.)

[7] In briefing, the United States noted that the "Road lies entirely to the south of the Common Line." (United States' Mot. for Summ. J. at 4, Dkt. #94.) This is not correct. Section A lies entirely south of the common line between Section 27 and Section 34. Section B—including the end of the Lower Elwha Road—lies largely north of the common line, in Section 27.

Title to Section B passed through a series of families from 1908 to 1936. From Makah Jim (June 1908) to the Fishers, to the Nordquists (Sept. 1908), to George Rhodes (1922), to the Halls (1923), to Charles Cayanus (1926). (Decl. of Tom Roorda, Ex. 5, Dkt. #92 at 79–84 (containing deeds to Government Lot 3 of Section 27)). In 1936, Charles Cayanus deeded all of Government Lot 3—including most of Section B of the Lower Elwha Road—to the United States to be held in trust for the Clallam Indians. (*Id.*, Ex. 5, Dkt. #92 at 84.) The deed contains no exceptions for County rights-of-way. Thus, while the County was deeded everything in Section A, the County never received proper title to Section B.

In 1968, the Secretary of the Interior issued a Reservation Proclamation, creating a reservation for the Lower Elwha Tribe. (McGillis Decl., Ex. 8, Dkt. #80 (Reservation Proclamation)).[8] A review of the Reservation Proclamation, which outlines the lands conveyed, excepts Section A of the Lower Elwha Road from the lands conveyed—but contains no such exception for Section B. (*Id.*, Ex. 8 at 2.) The Reservation Proclamation therefore indicates that Section B was owned outright by the Tribe. Indeed, the United States' expert witness, David Ironmonger, agreed that the United States owns the land in trust for the Tribe, although he ultimately concludes that the County has acquired "prescriptive rights" due to long term public use and maintenance. (Fobes Decl., Ex. 8, 79:11–81:4, Dkt. #91 (Ironmonger Dep.)).

In 2001, the Tribe deeded property containing portions of Section B to the United States to be held in trust for the Lower Elwha Klallam Tribe, and the deed was accepted by the Bureau of Indian Affairs. (Decl. of Michael J. Diaz, Ex. 10, Dkt. #95 (Statutory Warranty Deed)). The deed contains a general exception for "public roads and highways."

The deeds do not tell the entire story. The United States emphasizes that the County has displayed ownership at various times in the road's history. First, the County has maintained the entire Lower Elwha Road—Sections A and B. In approximately 1940, the County appears to

---

[8] The Indian Reorganization Act, 25 U.S.C. § 467 (referenced in the original Proclamation as "Section 7 of the Act of June 18, 1934), authorizes the Secretary to create new Indian reservations on "lands acquired pursuant to any authority conferred by this Act." *Id.* The Act also grants the Secretary broad discretion in acquiring lands to be used for a reservation: "The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 465; *see also* McGillis Decl., Ex 8 at 2 (1968 Reservation Proclamation stating that lands acquired for the Lower Elwha Indians were acquired under § 5 of the Reorganization Act, i.e., 25 U.S.C. § 465).

Order - 9

have begun maintaining the Lower Elwha Road. A list of County road improvements lists "resurfac[ing]" and does not distinguish between Section A and Section B. (Diaz Decl., Ex. 11 at 2, Dkt. #95.) Over the years, the County apparently maintained the road, cut back brush, put up signs, and constructed the berm. (*See* United States' Cross Mot. for Summ. J. at 9, Dkt. #94 (citing road logs, inspection documents, and expenditures)). But, this maintenance appears to have stopped, or at least have been severely reduced, after the Tribe ordered the County to remove the berm. (*See* McGillis Decl., Ex. 4, 56:2–4 & 63:4–11, Dkt. #80 (Tyler Dep.)). County representatives state that after the Tribe ordered the berm removed, the County ordered its employees to stop all maintenance on the road. Mr. Tyler, the County engineer, noted that "maintenance crews were told to not do anything [to Section B]," and at least one crew member was "chastised for . . . going beyond what we were instructed to not go beyond." (McGillis Decl., Ex. 4, 86:2–3; 62:7–8 (Tyler Dep.)). Any maintenance after approximately 2003 appears to have been done simply because it was easy to do. For example, Mr. Tyler noted that County maintenance crews oiled a portion of Section B because "we were at the end of our season and at the end of the week, and we can't hold this [leftover oil]," so "to get rid of it, they just shot it out until they were finished . . . ." (*Id.*, Ex. 4, 61:7–20.)

Second, in 1950, the County licensed the road for use by the U.S. military all the way to the Elwha River—necessarily including Section B. (Diaz Decl., Ex. 5, Dkt. #91 (Lease Agreement)). It is worth noting, however, that the license agreement includes pages of lengthy road descriptions, amongst which the reference to the Lower Elwha is buried.

Third, the United States notes that the Bureau of Indian Affairs "has no record" of owning the road. (Decl. of Richard De Clerk ¶ 4, Dkt. #31.) The BIA lists the entire Lower Elwha Road as a "county road right-of-way." (*Id.*)

## II.  DISCUSSION

Based on the foregoing facts, Plaintiffs argue that both the United States and Clallam County owed duties to maintain the road. Plaintiffs assert that Defendants failed to maintain the Lower Elwha Road as required by the Manual on Uniform Traffic Control Devices, a standard

issued by the Federal Highway Administration and used nationally for signing roadways. *See* 23 C.F.R. § 655.603(a).

Both the United States and Clallam County disclaim ownership of the road and seek cross summary judgment on the point. Additionally, the County argues that the road was maintained in compliance with the Manual, and that the County's actions were not a proximate cause of the injuries.

**A. Standard**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1221.

To succeed on a claim of negligence, a plaintiff must establish four elements: duty, breach, causation, and damage. *Keller v. City of Spokane*, 146 Wash. 2d 237, 242 (2002). Municipalities are held to the same standards as private individuals. Wash. Rev. Code § 4.96.010. Whether a municipality owes a duty in a particular situation is a question of law. *Keller*, 146 Wash. 2d at 243.

**B. Ownership of the Disputed Section of the Lower Elwha Road**

The dispute over who owns Section B of the Lower Elwha Road illustrates the imperfect intersection of law and real life. In short, the chain-of-title does not comport with the actual use

of the road. The United States argues that the County acquired prescriptive title to the Lower Elwha Road under Wash. Rev. Code § 36.75.070, which provides prescriptive title to roads maintained by a county for seven years:

> All public highways in this state, outside incorporated cities and towns and not designated as state highways, which have been used as public highways for a period of not less than seven years, where they have been worked and kept up at the expense of the public, are county roads.

Some form of this statute has existed since 1890. *See Todd v. Kitsap Cnty.*, 101 Wash. 2d 245, 250 (1984) (noting that "original predecessor to [the statute] was enacted in 1890" and "reenacted in 1937"). But—importantly—the County cannot have prescriptively acquired the land after Charles Cayanus deeded Section B to the United States in 1936. *Smale v. Noretep*, 150 Wash. App. 476, 483 (2009) (noting "rule prohibiting adverse possession against a sovereign") (citing *In re Yakima River Drainage Basin*, 112 Wash. App. 729, 746 (2002)); *Commercial Waterway Dist. No. 1 of King Cnty. v. Permanente Cement Co.*, 61 Wash. 2d 509, 512 (1963). Thus, if the County were to prescriptively acquire Section B, it must have done so between 1917 (the time the road was established) and 1936 (the time the road was deeded to the United States).

There is no evidence in the record that the County acquired Section B by prescription before 1936. The County surveyed and established Section B in 1917 and appears to have done little else. This does not appear to have been unusual. In Washington's early years, "county roads were often developed by [the] user." *Todd v. Kitsap Cnty.*, 101 Wash. 2d 245, 250 (1984). At some point, the public would "become accustomed to using these roads," and Wash. Rev. Code § 36.75.070 "provided counties with an incentive to expend public monies for this important development and maintenance and provided county residents with assured roads." *Id.* The road log presented by the United States—dating to 1890—suggests the same. (*See* Diaz Decl., Ex. 11 at 2, Dkt. #95.) The road log lists the 1916 petition to extend the road, the formal establishment in 1917, but only one "improvement," in 1922, which references "Halberg Rd. #273; Warner Rd.," and *nothing* relating to Section B. Quite simply, there is no evidence that the County "worked and kept up" Section B, or that the public even used the road.

Further analysis supports that conclusion.  First, and most importantly, the County ***has never*** asserted its right to title before or after the 1936 conveyance.  Second, the 1968 Reservation Proclamation specifically excepted Section A of the Lower Elwha Road from the newly-created reservation, but contained no exception for Section B—confirming that Section B was granted to the Lower Elwha Tribe.  Third, the 2001 conveyance from the Tribe to the United States contains no specific exception for a County right-of-way (although it does contain a generalized one).  Lastly, when the Tribe ordered the County to remove the berm, the County complied because ***both groups believed the land to be owned by the Tribe***.  That belief continued after the accident when the County replaced the berm only at the Tribe's behest.  (Fobes Decl., Ex. 1, 117:12–120:17 (Tyler Dep., Ex. 1)).[9]  The County and the Tribe's behavior makes sense only if the County had no claim to Section B.

Mr. Ironmonger, the United States' expert witness, agreed with the Court's assessment.  He concluded that in March 2007, the time of the accident, the "U.S. Government owned Government Lot 3 and the northeast quarter and the northwest quarter"—encompassing Section B.  (Fobes Decl., Ex. 8, 80:11–15 (Ironmonger Dep.)).  Although Mr. Ironmonger concluded that the County had prescriptive rights (*see id.*, Ex. 8, 81:7–17), as noted above, the County cannot have prescriptively acquired the land after the 1936 Cayanus-deed.

In sum, the County has never held either proper title or prescriptive title to Section B of the Lower Elwha Road.  Thus, when the Tribe requested that the County remove the berm at the end of Section B, the County had no choice but to comply.

**C.  Duty to Maintain the Lower Elwha Road**

Plaintiffs argue that both the United States and Clallam County owed duties to maintain Section B of the Lower Elwha Road because the former held legal title and the latter possessed the road and voluntarily assumed a duty to warn of dangerous conditions.  (*See generally* Pls.' Mot. for Partial Summ. J.)  The "threshold question of whether a duty exists is a question of law."  *Tincani v. Inland Empire Zoological Soc'y*, 124 Wash. 2d 121, 127–28 (1994).  The Court will address each Defendant in turn.

---

[9] The Court may properly consider the County's removal or replacement of the berm for purposes of establishing ownership.  Fed. R. Evid. 407 (Subsequent Remedial Measures).

### 1. Duty Owed by the United States

The United States argues that its position as trustee does not make it a guarantor of safety for all trust land. Recently, in *Robinson v. United States*, No. 04-cv-0734, 2011 WL 302784 (E.D. Cal. Jan. 27, 2011), a federal district court agreed with the United States' position, holding "there is a distinct difference between the Government's potential liability under a 'bare trust' and those where the government has assumed 'full responsibility for management.'" *Id.* at *7. There, the plaintiff argued that a tribe's construction of homes and a casino caused damage to his easement. *Id.* at *1 (alleging damages from lateral and subjacent support, negligence, and nuisance). Plaintiff argued that the United States, as trustee, should be liable for the tribe's conduct. The court disagreed: "the trust relationship, standing alone, is insufficient to trigger liability for damages on the part of the United States." *Id.* at *7 (citing *U.S. v. Navajo Nation*, 556 U.S. 287, 294 (2009)). The court reasoned that the Secretary of the Interior had no control over the tribe's construction and no statute or regulation imposed any duty to exercise control or answer for damages. *See id.* at *8 ("Robinson points to no statute or regulation that requires the Secretary . . . to approve the plans of the Tribe.").

Similarly, it is undisputed here that the United States never controlled any portion of the Lower Elwha Road: no signs, lights, berms, brushing, mowing, paving, or anything else. Plaintiffs' argument rests solely on the faulty assumption that United States' position as trustee created a general duty to maintain roads on trust lands. They cite no statute or case law supporting such a position. The Court must therefore conclude that the United States owed no duty to Plaintiffs.

### 2. Duty Owed by Clallam County

The County's position is more complex. While the United States holds legal title, the County voluntarily maintained the entire Lower Elwha Road from approximately 1940 until the time the Tribe ordered the berm removed in approximately 2003. Plaintiffs present two arguments: (1) Plaintiffs argue that even if the County is not the titled owner, it possessed the road and therefore assumed a duty to reasonably maintain it; (2) Plaintiffs argue that the County

voluntarily warned users of the road's dangerous conditions, and thereby assumed a duty to warn under the rescue doctrine.

### a. Duty Arising From Possession

Washington courts have followed the Restatement (Second) of Torts § 328E in recognizing tort liability based on possession of land. *Coleman v. Hoffman*, 115 Wash. App. 853, 859 (2003) (citing *Ingersoll v. Debartolo, Inc.*, 123 Wash. 2d 649, 655 (1994) (citing Restatement (Second) of Torts § 328E (1965))). In *Coleman*, the court reasoned that it is not title that gives rise to liability; rather, "[t]he critical point is the possession itself." *Id.* at 860. Following the Restatement, the court defined a possessor of land as:

> (a) a person who is in occupation of the land with intent to control it or
>
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
>
> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

*Id.* The question is whether the County possessed Section B of the Lower Elwha Road on the night of the accident.

The facts can compel only one answer: the County did not possess Section B in March 2007. Before 2003—when the Tribe ordered the berm removed—there is little doubt that the County possessed the road. Until that time, the County was the sole entity maintaining the road: it graded the surface, mowed and brushed the vegetation, and placed the signs. While the County's briefing downplays the extent of its care (indeed, the section of road is not even a quarter mile long), no one else appears to have had any hand in maintaining the road. But that changed when the Tribe ordered the berm removed.

When the Tribe ordered the berm removed, the County relinquished occupation of the land. As Mr. Roening's testimony shows, the County resisted removal of the berm but acquiesced to the Tribe's request. The County then instructed its employees not to maintain the Lower Elwha Road past the quarter-corner—i.e., Section B. The fact that County employees occasionally disobeyed that order does not suggest an "intent to control." It suggests merely that it was easy for County employees to dump remaining supplies on Section B. Further, after the

accident, the County restored the berm only at the request of the Tribe.  This is not the conduct of an entity with an "intent to control."  In short, there is no evidence demonstrating that the County possessed Section B at the time of the accident.

### b. Duty Arising Under the Rescue Doctrine

Under the so-called "rescue doctrine," "liability can arise from the negligent performance of a voluntarily undertaken duty." *Folsom v. Burger King*, 135 Wash. 2d 658, 676 (1998).  Thus, "a person who undertakes, albeit gratuitously, to render aid to or warn a person in danger is required by Washington law to exercise reasonable care in his or her efforts." *Id.* (citing *Brown v. MacPherson's, Inc.*, 86 Wash. 2d 293, 299 (1975)).  If a "rescuer" fails to use reasonable care "and consequently increases the risk of harm to those he or she is trying to assist, the rescuer may be liable for physical damage caused." *Id.*  Further, a person who voluntarily "promises to perform a service for another in need has a duty to exercise reasonable care when the promise induces reliance and causes the promisee to refrain from seeking help elsewhere." *Id.*  This duty may extend to public entities.  *Osborn v. Mason Cnty.*, 157 Wash. 2d 18, 26 (2006).

Plaintiffs' rescue argument is simply a reformulation of the possession argument and must fail for the same reason.  Once the County turned over possession of Section B to the Tribe, it turned over its duty to maintain the road as well.  The situation here is analogous to that in *Folsom v. Burger King*, 135 Wash. 2d 658 (1998), where the estates of two Burger King employees murdered during a robbery sued the restaurant's former security firm.  The plaintiffs argued that the security firm—whose contract had been terminated almost 10 months before the robbery—failed to remove security equipment, thus giving rise to a duty to aid. *Id.* at 676–77.  The Washington State Supreme Court ruled that the security firm had no duty to rescue because the act of leaving the security system in place happened long before danger became "imminent," because the security firm did not know the murders would take place, and the firm did not "withdr[aw] from rescuing once the employees were in danger." *Id.* at 677.  Further, the failure of the security firm to call aid—even though it received a signal from the restaurant's security system—did not create additional harm or induce reliance. *Id.*  Thus, the security firm owed no duty to rescue.

Like the security firm, the County had been expelled from the property—Section B—long before the accident. And although robberies and car accidents may be generally foreseeable, neither the security firm in *Folsom* nor the County knew of imminent danger to the specific plaintiffs. Lastly, Plaintiffs have presented no evidence that lack of signs or lighting *increased* the existing dangers or that anyone in Sela Kalama's car justifiably relied on the absence of additional safety devices that night.

In support of their position, Plaintiffs rely on *Brown v. MacPherson's, Inc.*, 86 Wash. 2d 293 (1975), in which the plaintiffs sought to recover damages from Washington State after an avalanche in 1971. There, a "noted avalanche expert" contacted a state agent and a real estate broker and warned them that the plaintiffs' property lay in a "high-risk avalanche area." *Id.* at 298. The state agent "responded in a manner which led [the expert] justifiably to believe that the [agent] would deal with the matter and convey his warning to [plaintiffs], causing him to refrain from taking further action to warn appellants himself." *Id.* The state agent then met with the broker and others and "led them to erroneously believe that his information indicated no avalanche danger existed . . . ." *Id.* These facts are quite contrary to the situation here.

First, unlike the state in *Brown*, Clallam County has not made any affirmatively inaccurate representation to Plaintiffs. The signs on Sections A and B in no way suggest that the Lower Elwha River *did not* lie at the end of the road. And in any event, Ms. Kalama knew the river lay at the end of the road—that's where she was going. Second, as noted previously, the County's signs did not increase the danger posed by the river. Third, Plaintiffs have not suggested how either Ms. Kalama or the deceased justifiably relied on the absence of signs when speeding down the Lower Elwha (and ignoring the signs present).

In sum, the rescue doctrine cannot be applied as a general duty against the County to cover the holes in other theories of liability. The County did not possess Section B at the time of the accident, it did not undertake to rescue Plaintiffs, made no misrepresentations, and did not increase the danger to Plaintiffs through its affirmative conduct.

Given that neither the County nor the United States owed a duty to maintain Section B of the Lower Elwha Road, the Court need only briefly address the parties' remaining arguments.

**D. Breach**

Plaintiffs argue that the County breached its duty of care to maintain Section B of the Lower Elwha Road. As evidence of breach, Plaintiffs argue that the road was "inherently dangerous" and that the County failed to comply with the Manual on Uniform Traffic Control Devices. (Pls.' Mot. for Summ. J. at 20.) Plaintiffs have presented an expert report stating that the County should have used "[r]eflectorized devices . . . to identify the road ending, in compliance with the Manual on Uniform Traffic Control Devices." (Supp. McGillis Decl., Ex. 2 at 6, Dkt. #105 (Report of Henry J. Borden)).

At its heart, Plaintiffs confounding argument might be summarized like this: "The County should have maintained an end-of-road sign after the County was ejected from the end of the road and forced to take down its end-of-road sign." (*See id.* at 23 ("The [Defendants'] failures to install a proper end of road reflective barrier proximately caused or contributed to the death of Miss Francis and Mr. Scroggins.")). The County cannot have breached because it had no duty to maintain the road in March 2007. But even assuming breach, Plaintiffs' real hurdle is causation.

**E. Causation**

Under similar circumstances, Washington courts have repeatedly found proximate cause lacking. Proximate cause consists of two elements: cause in fact and legal causation. *Hartley v. State*, 103 Wash. 2d 768, 777 (1985). "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." *Id.* at 778 (citation omitted). Legal causation, on the other hand, "is grounded in policy determinations as to how far the consequences of a defendant's acts should extend." *Crowe v. Gaston*, 134 Wash. 2d 509, 518 (1998). "It involves a determination of whether liability should attach as a matter of law given the existence of cause in fact." *Hartley*, 103 Wash. 2d at 779. Even where negligence is proved, the determination of legal liability depends upon "'mixed considerations of logic, common sense, justice, policy, and precedent.'" *Id.* (quoting *King v. City of Seattle*, 84 Wash. 2d 239, 250 (1974)). "[T]he question in a legal causation analysis is whether, as a matter of policy, the connection between the defendant's act and its ultimate result is too remote or insubstantial to

impose liability." *Cunningham v. State*, 61 Wash. App. 562, 572 (1991). "Where the facts are not in dispute, legal causation is for the court to decide as a matter of law." *Crowe*, 134 Wash. 2d at 518.

Numerous Washington courts have held that extreme negligence by a driver may preclude legal causation. For example, in *Lowman v. Wilbur*, No. 65359-8-I, 2011 WL 2535511 (Wash. Ct. App. June 27, 2011) (unpublished opinion),[10] the Washington State Court of Appeals addressed similar facts and discussed at length the precedent analyzing negligent drivers and legal causation. There, the plaintiff got into a car with an intoxicated driver, who subsequently lost control of the vehicle and struck a utility pole. *Id.* at *1. The driver later pleaded guilty to vehicular assault. *Id.* In addition to the driver, the plaintiff sued the utility company and Skagit County, arguing that negligent placement of the pole in a "sharp curve" exacerbated the injuries. Even though the utility company and the county expressly ***conceded negligence***, both the trial court and court of appeals held that legal causation was lacking. *Id.* at *5. Given the intoxication of the driver, and the fact that defendants had done nothing "to precipitate the departure of [the] vehicle from the roadway," policy considerations "dictate[d] a determination that the connection between the alleged negligent acts . . . [was] too remote to impose liability." *Id.*[11]

Similarly, in *Cunningham v. State*, 61 Wash. App. 562 (1991), the state court found legal cause lacking where an intoxicated driver ran into a barricade. The driver sued, arguing that negligent striping and lighting caused the accident. *Id.* at 570. The court noted that the plaintiff was intoxicated and could see the barricade, yet still struck it. *Id.* The court concluded that "neither logic, common sense, justice, nor policy favors finding legal causation here." *Id.* at 571.

In *Klein v. Seattle*, 41 Wash. App. 636 (1985), the court refused to hold that negligent road design legally caused an accident in which a speeding driver with a BAC of .04% crossed

---

[10] A court may take judicial notice of unpublished state court opinions. *Harris v. Health & Human Servs.*, 2012 WL 761981, at *1 (E.D. Cal. Mar. 6, 2012) (citing *MGIC Indem. Co. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980)).

[11] The Court notes that the parties rely on *Keller v. City of Spokane*, 146 Wash. 2d 237 (2002). *Keller* did not change the legal causation analysis: trials courts "still retain[] [their] gatekeeper function and may determine that a municipality's actions were not the legal cause of the accident." *Keller*, 146 Wash. 2d at 252; *see also Lowman*, 2011 WL 2535511, at *4 (providing a thorough analysis of *Keller*'s effect).

the center line and collided with another vehicle. The court noted that the city "cannot be expected to guard against this degree of negligent driving." *Id.* at 639. To impose liability would essentially impose an insurance policy protecting against the "depredations and negligence of the reckless, careless and drunken operator." *Id.* Thus, where the precipitating factor to an accident is a driver's own extreme negligence, Washington courts may find legal causation lacking.

As in the cases cited above, the Court must conclude that the driver's extreme negligence—intoxication, speeding, texting, and Ms. Kalama's failure to listen to her passengers telling her to stop—precipitated the accident and precludes legal causation. Ms. Kalama was ignoring the signs present—specifically, the posted speed limit. Even with her highbeams on, she was quite obviously driving at a speed that did not allow her time to see and react to the terrain ahead (especially given her intoxication). She was swerving off the road. She was using her phone. She was relying on her passengers to tell her when to stop. She did not so much as brake before going into the river. Moreover, Plaintiffs have presented no authenticated evidence that any person other than Sela Kalama has ever actually driven over the boat launch. While the Tribe, or the United States, or the County might have barricaded the end of the road or might have supplied reflective signs, it was Ms. Kalama's intoxication, speed, and inattentiveness that were the immediate and legal causes of the accident.

### III.  CONCLUSION

For the reasons stated above, the County's motion for summary judgment (Dkt. #90) and the United States' motion for summary judgment (Dkt. #94) are **GRANTED**. Plaintiffs' motion for partial summary judgment (Dkt. #79) is **DENIED**.

Dated this 3rd day of August 2012.

                                                          _____
                                                          Ronald B. Leighton
                                                          United States District Judge